William C. Hecht, J.
This petition seeks the construction of three provisions of a trust indenture. It is brought by the executor of the deceased settlor remainderman.
The indenture was executed on January 25,1927. It was part of a divorce settlement between the settlor and his wife. The latter, though not judicially declared incompetent, is incapable of managing her own affairs, and is represented in this proceeding by a special guardian.
The original trust property consisted of $10,800 in cash and $546,000 par value of what were then apparently considered the highest grade of government, railroad and industrial bonds. It provided that the trustees should pay and apply to the use of the settlor’s wife the sum of $10,000 during her life; and the further sum of $10,000 per annum during her life or until her remarriage. The wife has not remarried. The residue of the income was to be paid over to the settlor and to his estate after his death. Upon the wife’s death, the principal shall be paid over to the settlor, or to his estate, if he should predecease her.
The first provision whose construction is sought is that governing the investment powers of the trustees. It reads as follows: “2. In the discretion of the Trustees the invested principal of the said trust property and estate, and any part thereof, may remain in the securities in which the said principal is now invested, or may be sold and the proceeds thereof, and the uninvested principal of the said trust property, may be invested and reinvested in the securities of the public debt of the United States or of any City, County or State in the United States, or in the public stocks or funds of Great Britain, in bonds secured by mortgage upon unencumbered real estate, either improved or unimproved, in the State of New York, to an amount not exceeding two-thirds of the assessed value thereof, or in mortgages or mortgage participation certificates guaranteed by any title or mortgage company _ incorporated under the laws of New York and having an office in the City of *217 New York, or in stocks of any bank or trust company or in bonds or stocks of any railroad, business, manufacturing or commercial corporation in the United States which shall have paid dividends of not less than four per cent per annum upon its common stock for a period of at least five years next preceding the time of such investment or reinvestment.”
On July 23, 1935, the settlor and trustees executed an agreement by which the foregoing paragraph 2 “ is hereby amended nunc pro tunc ” so as to read as follows:
“ In the discretion of the Trustees the invested principal of the said trust property and estate, and any part thereof, may remain in the securities in which the said principal is now invested, or may be sold and the proceeds thereof, and the uninvested principal of the said trust property, may be invested and reinvested in the securities of the public debt of the United States or of any City, County or State in the United States, or in the public stocks or funds of Great Britain, in bonds secured by mortgage upon unencumbered real estate, either improved or unimproved, in the State of New York, to an amount not exceeding two-thirds of the value thereof, or in mortgages or mortgage participation certificates guaranteed by any title or mortgage company incorporated under the laws of New York and having an office in the City of New York, or in the bonds of any railroad, business, manufacturing or commercial corporation in the United States, England or the Dominion of Canada, then paying interest thereon at the agreed rate, or in the stocks or shares of any such corporation then paying a dividend thereon.
‘ ‘ 2. Paragraph numbered 5 of the Indenture aforesaid is hereby amended by substituting the Corn Exchange Bank Trust Company, of the City of New York, in the place and stead of the American Exchange Irving Trust Company therein mentioned. ’ ’
All parties are agreed that the 1935 agreement is ineffectual to amend the trust indenture because the latter contained no reserved power to amend or revoke, and no consent to the attempted amendment was obtained from the life tenant (Personal Property Law, § 12; Schoellkopf v. Marine Trust Co., 267 N. Y. 358, 362). Nevertheless, acting in compliance with what apparently they understood to be a valid amendment, the trustees completely changed the trust investments. They sold all but $52,000 of the bonds. They purchased $30,000 of corporate stock of the City of New York and $4,000 in bonds which conformed to the provision in the trust indenture; and $10,000 in Lehigh Valley Railway bonds, and $6,000 in New York, New Haven & Hartford bonds which did not so conform. The balance *218 of the proceeds was invested in common stocks. While these stocks, for the most part, are of well-known corporations and would appeal to an investor seeking to preserve his capital and protect himself against inflation, only two of them conform to the stated requirement of the trust indenture — 201 shares of American Telephone & Telegraph and 200 shares of Carolina, Clinchfield & Ohio Railway.
Fortunately, up to this time the life tenant has not been harmed, and the remainderman has profited from this inadvertent error of the trustees. The special guardian’s report states that, since the change in investments, the fund has never earned less than $20,000 per annum; that up to 1945 the income varied between $22,000 and $26,000 per annum; that it rose constantly from that time until it was over $48,000 in 1957; and that the life tenant has been receiving the stipulated payment of $20,000 a year. His report states further that the fund had a market value on April 1, 1957 of approximately $1,060,000 — an appreciation of 100%. My computations indicate that it has approximately the same value today.
However, making proper allowance for the good investment judgment of the trustees, it must be recognized that they have had the advantage of a generally rising market since 1935, when the change in investments was started. It does not follow that this situation will continue with certainty for the life of the life tenant. The most important consideration here is her assured protection. She derives no benefit from any surplus income above the $20,000 a year stipulated for her, nor from any increase in the value of the corpus. Both of these advantages inure solely to the settlor’s estate. How that the situation has been brought to the court’s attention by this application for instructions, the trust indenture must be enforced as closely as possible according to its expressed terms.
When the trust was created, the income from the bonds transferred to the trust was $27,500. These bonds on which the stipulated interest payments were an absolute obligation and whose obligors have consistently paid the interest on their outstanding indebtedness, gave greater assurance of non-interrupted payment of the $20,000 annual income to the life tenant than do the present investments, despite the fact that they have twice the original capital value and paid over $48,000 in 1957. Only $4,000 of this amount represents bond investment, the balance being dividends from stocks. If at any time business conditions should be such that many of these companies would substantially reduce dividends or omit them altogether, the income would fall below the stimulated $20,000 ner annum. *219 Since the life tenant is incapable of managing her own affairs, and has been in and out of mental institutions for many years, any such impairment of income, or even delayed payment thereof, would have tragic consequences. It would frustrate the declared purpose of the settlor in setting up the trust, and would impair what may have been the inducing consideration for the divorce settlement.
If the unauthorized investments were liquidated now, after capital gains tax of about $125,000, the corpus available for investment would be about $875,000. Sixty-five per cent of this or about $575,000 should be invested in legal investments pursuant to the provisions of section 21 of the Personal Property Law, other than those authorized by paragraph (m) of subdivision 1 thereof. Such investments can be purchased to yield between 3%% and 4% per annum. An average yield of 3%% would produce an income of $21,500 per annum, which of itself should assure the life tenant of her stipulated $20,000. The trustees may invest the balance of $300,000, if they so desire, in securities permitted by paragraph (m) of subdivision 1 of section 21 of the Personal Property Law. This would give the remainderman the protection ag;ainst inflation which the Legislature has deemed adequate, without risking the paramount claim of the life tenant to the assured payment of $20,000 a year. It is to be expected that these investments will produce some income, which will compensate for the possibility that the income from some of the other investments might on occasion be suspended or delayed. The settlor’s testator, the individual successor trustee, the two banlis which each claims to be entitled to the designation of corporate successor trustee, and the life tenant’s special guardian have joined in requesting the court to construe the investment provision “ so as to permit investment in bonds and common stocks which at the time of acquisition and for five years previously have paid a dividend, omitting the requirement that the dividend amount be not less than 4%.” I see no justification for adopting this suggestion. The reasons urged for such construction are not persuasive.
First, it is argued “ that the 4% condition was no longer possible of compliance because corporations now consistently declare dividends on a dollar per share basis and the amount on which the 4% is to be computed can no longer be determined with any certainty, more so as it applied to common stocks with no par value or stocks having a par value which sold in excess of their par value.”
*220 The premise is true. But the conclusion does not follow that assurance of income to the life beneficiary must therefore be ■sacrificed. Where the provisions of a will limiting the trustee to a particular type of investment is held to be inapplicable under current economic conditions, the trustee will be relieved from the restrictive provision of the will, and will be permitted to invest trust funds in the investments authorized by law. This was decided by Surrogate Frankenthaler in Matter of Flanagan (199 Misc. 842, citing numerous cases reported in the New York Law Journal) and by Surrogate Collins in Matter of Daly (203 Misc. 851, 854-855).
This was the extent of relaxation from a nonrealistic restriction permitted in the case of a will, where the primary objective was to carry out the presumed intention of the testator. No greater relaxation should be permitted here where an equally important objective is to prevent impairment of the consideration which the life tenant presumably bargained for in this trust agreement as part of the divorce settlement.
A second argument urged is that liquidation of the stocks will subject the trust to a capital gains tax. It may be well to remind the parties that many investors, who refused to realize profits because they did not desire to pay a capital gains tax, finally accomplished their objective of avoiding the tax by losing their profits. In any event, the life tenant’s protection may not be sacrificed because the remainderman is opposed to liquidating the unauthorized investments at a net profit of 75%.
The court instructs the trustees that they are authorized to invest the funds of the trust solely in accordance with the provisions of section 21 of the Personal Property Law and that this requirement should be complied with within 120 days after entry of the order herein.
The second question presented is as to who is the properly designated successor trustee — Irving Trust Company as successor to American Exchange Irving Trust Company; or Chemical Corn Exchange Bank, as successor to Corn Exchange Bank Trust Company.
The trust indenture named Ernest A. Bigelow and Harold D. Beatty as trustees. It contained the following provision for succession: “ 5. In the event of the death of either of the Trustees the survivor of them shall thereupon succeed to the estate and interest of such deceased Trustee in the said trust property and estate. The said Trustees, the survivor of them and their successors, are hereby authorized from time to time to nominate and appoint, by an instrument in writing duly acknowledged, a *221 new Trustee to act in place of either of the said Trustees or their successors who shall cease or be unable to act as such from any cause, and the person or corporation so appointed shall, upon the occurrence of a vacancy, become vested with all the estate and powers of a Trustee hereunder, the same as if named herein as such. Clifton P. Williamson of the City of New York, New York, is hereby appointed a successor Trustee to fill the first of such vacancies; William Ewing, of the firm of J. P. Morgan & Company, is hereby appointed a successor Trustee to fill the second of such vacancies (or should the said Clifton P. Williamson fail to qualify as Trustee hereunder, then the first of such vacancies); the American Exchange Irving Trust Company of the City of New York is hereby appointed a successor Trustee to fill the next succeeding vacancy. ’
The subsequent agreement dated July 23, 1935, provided Paragraph numbered 5 of the indenture aforesaid is hereby amended by substituting the Corn Exchange Bank Trust Co., of the City of New York, in the place and stead of the American Exchange Irving Trust Co. therein mentioned.”
This agreement could not operate as an amendment of the trust indenture, inasmuch as the life tenant did not consent thereto (Personal Property Law, § 23; Schoellkopf v. Marine Trust Co., 267 N. Y. 358, supra). Chemical argues that “ the only nonconsenting beneficiary had no real interests in the question whether one skilled bank or the other skilled bank should be the successor corporate trustee.” Since it must be conceded that any beneficiary would have a very real interest in the substitution of one individual for another as trustee, I cannot accept the argument that a different principle applies where banks are involved, no matter how “ skilled ” they may be.
For this reason, it is of no consequence that the settlor in 1935 obviously preferred to have Chemical’s predecessor become successor trustee. The life tenant acquired a vested right in 1927 to have Irving’s predecessor fill this position. She cannot be deprived of that vested right by any act of the settlor or the trustees. The 1935 agreement having failed in its avowed purpose of amending the indenture, it cannot be given indirect effect by the circumlocution of holding what all parties treated as an amendment, as being in effect a nomination and appointing by the named trustees of a successor trustee. In any event, as I construe the original trust indenture, it gives the trustees the appointing power only in the event that the trustees named therein fail to serve. This is emphasized by the fact that *222 Williamson is appointed a successor trustee ‘ ‘ to fill the first of such vacancies ’ ’; Ewing is appointed ‘ ‘ to fill the second of such vacancies ”, (or, if Williamson fails to qualify, “ then the first of such vacancies ”); and Irving’s predecessor is appointed ‘ ‘ to fill the next succeeding vacancy.” It would seem a cardinal principle of construction to give preference to trustees named in the instrument over unnamed persons whose appointment is delegated to others, unless the contrary intention clearly appears and such contrary intention may not be tortured out of the sequence of the sentences. Neither may it be implied from the fact that one of the named trustees is a corporation. It would still be necessary to give a residual power to appoint trustees to act in place of the trustee who ceases to act for any cause, because a named corporate trustee might be unwilling or unable to act.
This principle of construction should be adhered to here because, as already stated, we are concerned not only with the grantor’s presumed intention, but also with what the beneficiary would reasonably understand the indenture to provide.
The conclusion is that Irving Trust Company is the duly designated successor trustee to fill the vacancy created by Beatty’s death and Ewing’s failure to qualify.
The final question is the construction of paragraph “ 6 ” of the indenture. This gave the trustees discretionary power to use J. P. Morgan & Co. as depository. An agreement between the settlor and the trustees executed in March, 1940 changed this to a mandatory direction. All parties are agreed that the purported amendment is ineffectual for the reasons already stated. The instructions are that the trustees are authorized, in their discretion, but not required, to use J. P. Morgan & Co. as depository. It is for the trustees rather than the court to decide whether to save custodial charges by transferring the securities to the custody of the corporate trustee.
Settle order.